IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


KERI A. TEODECKI,          )     CASE NO.  1:20-cv-00867
                         )
          Plaintiff,     )     MAGISTRATE JUDGE
                         )     KATHLEEN B. BURKE
          v.              )
                         )
COMMISSIONER OF SOCIAL     )
SECURITY,                )
                         )     **MEMORANDUM OPINION & ORDER**
          Defendant.     )


       Plaintiff Keri A. Teodecki ("Plaintiff" or "Teodecki") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her applications for social security disability benefits.  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 13.

       For the reasons explained herein, the Court finds that the ALJ either overlooked or

misconstrued evidence relating to Teodecki's subjective allegations of extreme fatigue and,

without a more thorough analysis, the Court is unable to determine whether the ALJ's

assessment of Teodecki's subjective allegations regarding her fatigue and/or the decision finding

Teodecki not disabled are supported by substantial evidence.  Accordingly, the Commissioner's

decision is **REVERSED AND REMANDED** for further proceedings consistent with this opinion and order.

## I. Procedural History

On March 7, 2017, Teodecki protectively filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI").[1]  Tr. 194, 290, 291, 397-398. Teodecki alleged a disability onset date of January 3, 2017.  Tr. 194, 418.  She alleged disability due to seizures, migraines, past head injury, PTSD, fatigue, neuropathy, and pain in left leg.  Tr. 265, 293, 320, 338, 421.

After initial denial by the state agency (Tr. 320-335) and denial upon reconsideration (Tr. 338-349), Teodecki requested a hearing (Tr. 350-351).  A hearing was held before an Administrative Law Judge ("ALJ") on October 5, 2018.  Tr. 211-263.  On December 27, 2018, the ALJ issued an unfavorable decision (Tr. 190-209), finding that Teodecki had not been under a disability, as defined in the Social Security Act, from January 3, 2017, through the date of the decision (Tr. 194, 203).  Teodecki requested review of the ALJ's decision by the Appeals Council.  Tr. 394-396.  On February 28, 2020, the Appeals Council denied Teodecki's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-7.

## II. Evidence

### A.    Personal, vocational and educational evidence

Teodecki was born in 1982.  Tr. 202, 397.  At the time of October 5, 2018, hearing, Teodecki was living with her boyfriend and his two children, ages 9 and 11.  Tr. 217.  Teodecki graduated from high school and, following that, she became a volunteer firefighter and EMT.

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. We may use this date to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 7/6/2021).

Tr. 219, 227-228. Teodecki's last job was working in the billing/collections department at Drug Mart a year or two before the hearing. Tr. 220.

**B.     Medical evidence**

**1.     Treatment history**

In 1992, when Teodecki was nine years old, she suffered a traumatic brain injury following an automobile accident. Tr. 807. She was in the hospital for a few months and in a coma for at least one month. Tr. 807. Teodecki was able to return to school after six months and received therapy. Tr. 807. She graduated from high school with her class. Tr. 807. After high school, Teodecki started having seizures. Tr. 807. Teodecki was in a second car accident in 2001. Tr. 807.

On May 4, 2016, Teodecki was seen at Summa Health System Emergency Department after having fallen out of her bed and hitting her wrist on the nightstand. Tr. 477. Teodecki developed bruising and sought emergency room treatment because of the pain she was having when she moved her wrist. Tr. 477. The emergency room treatment records from the visit noted a history of seizures. Tr. 480. X-rays were taken and Teodecki was discharged with a diagnosis of contusion. Tr. 481, 482-484.

On May 16, 2016, Teodecki had an adult diagnostic assessment completed at Solutions Behavioral Healthcare, Inc. ("Solutions"). Tr. 492-502. She discussed suffering a traumatic brain injury from a car accident in 1992 or 1993 but did not recall much about it. Tr. 495, 497, 501. Teodecki discussed relationship problems that she had recently experienced with her significant other who was abusive towards her.[2] Tr. 492, 497. Following an argument, her significant other made a report to the police and Teodecki ended up being charged with domestic

_____

[2] Teodecki's ex-husband was also abusive towards her. Tr. 500.

violence. Tr. 492, 496, 500. Teodecki indicated she had never been in trouble before. Tr. 496. Teodecki reported no history of prior mental health services. Tr. 500. Teodecki's mother was her main support at that time. Tr. 500. Teodecki was diagnosed with intermittent explosive disorder. Tr. 501. She was referred for individual counseling and it was noted that Teodecki would identify appropriate ways of dealing with anger. Tr. 500, 501. On May 19 and May 26, 2016, Teodecki attended individual counseling sessions. Tr. 503-504, 694-695. During her May 26, 2016, session, Teodecki explained that she was having a difficult time dealing with the recent separation between her and her significant other and the restraining order that had been entered against her. Tr. 503. She expressed difficulty finding closure. Tr. 503.

On November 10, 2016, Teodecki saw Heather Miller, CNP, at Summa Physicians, Inc., with complaints of left knee pain with a tender bump below her right knee.[3] Tr. 508, 571. Teodecki explained that she had been having left knee pain for over a year and the tender bump below her knee had been going on for three or four days. Tr. 508, 571. Teodecki had been elevating her knee, icing it, and taking Naproxen 500 mg a few times each day. Tr. 508, 571. A physical examination revealed tenderness in the left leg below the knee with swelling; painful range of motion in the left knee; and normal mood and affect. Tr. 509, 572. The assessment was left leg swelling and left knee pain, unspecified chronicity. Tr. 509, 572. The plan included a duplex venous left upper extremity ultrasound; x-ray of the left knee; and seeing ortho for her right knee. Tr. 509, 572. The ultrasound was normal. Tr. 509.

---

[3] There is some confusion in the November 10, 2016, treatment note as to which complaints pertain to which knee. *Compare* Tr. 508, 571 (Patient complains of "left knee pain and below knee tender bump . . ."; "The tender area below the right knee . . ." and "Right knee pain and swelling . . .") *with* Tr. 508, 572 ("L leg just below knee w/tender, swollen area . . .").

During 2016 and 2017,[4] Teodecki saw Dr. Roswell Dorsett, D.O., of the Western Reserve Health System. Tr. 666-678, 706-715. During these visits, Teodecki complained of, or Dr. Dorsett assessed, seizures, headaches, migraines, vertigo, dizzy spells, fatigue, sleep apnea, and a swollen left lower extremity with left leg pain. Tr. 667, 669, 670, 672, 674, 676, 706, 709, 711, 713, 715. Physical examination findings were normal. Tr. 667, 671, 674, 706-707, 709, 711, 713. Her seizures were well controlled with medication. Tr. 667, 669, 671, 672-673, 711, 713. Dr. Dorsett noted that a fever could cause a seizure and Teodecki should therefore not work if she had a fever. Tr. 674, 711. During a 2017 visit, Teodecki reported that she was snoring loudly at night and had excessive daytime sleepiness. Tr. 706. Dr. Dorsett ordered testing to assess Teodecki for sleep apnea. Tr. 706. At that visit, Dr. Dorsett also ordered testing to assess for peripheral vestibulopathy due to her reports of daily vertigo. Tr. 706. During another 2017 visit, Dr. Dorsett also ordered a CT scan for Teodecki's seizure disorder. Tr. 663, 676.

Upon Dr. Dorsett's referral, on January 24, 2017, Teodecki had a head CT scan. Tr. 663. The CT scan showed "mild parenchymal volume loss[.]" Tr. 663-664.

Upon Dr. Dorsett's referral, vestibular testing was performed on March 30, 2017. Tr. 716-719. The clinical impression from vestibular testing was "central vestibular disease . . . secondary to her vertical upbeating nystagmus[[5]" which was noted throughout the testing, "constant when fixation [was] removed." Tr. 716. "[T]here [were] no signs of nystagmus consistent with peripheral vestibular disease." Tr. 716. Recommendations were made, including

---

[4] The medical records from this time period are blurry and it is difficult to discern the exact dates but, the records appear to relate to the 2016-2017 time period. Tr. 666-678, 706-715; *see also* Doc. 16, p. 3 and Doc. 19, p. 2 (discussing the noted records).

[5] Nystagmus is "Rapid, rhythmic, repetitious, and involuntary eye movements. Nystagmus can be horizontal, vertical, or rotary. Whatever form it takes, nystagmus is an abnormal eye finding and a sign of disease within the eye or the nervous system." https://www.medicinenet.com/nystagmus/definition.htm (last visited 7/6/2021).

further assessment to rule out central vestibular disease and brainstem disease" and that Teodecki have "vestibular rehab protocols as part of her physical therapy." Tr. 716.

On March 23, 2017, Teodecki saw Barbara Gardner, a therapist at Solutions. Tr. 680-682, 793-795. Teodecki's most recent assessment was in May 2016. Tr. 680. Under the "reason for referral" section, it was noted that "Keri is a 35 year old, divorced, unemployed female who is here because 'I am applying for disability and my attorney suggested I come back here and my doctor." Tr. 680. Teodecki's "presenting problem" was that she could not get her ex-boyfriend or ex-husband out of her head or her car accident that occurred in 1992. Tr. 680. Teodecki reported having a "small, strong circle of friends[.]" Tr. 680. Ms. Gardner's notes reflect that Teodecki had an IEP while in school, noting "learning disability - due to accident - brain injured and judgment off[.]" Tr. 680. With respect to Teodecki's mental health treatment history, Teodecki indicated that she received therapy back in 1992-1993 but could not recall it and she received treatment briefly at Solutions a few months earlier. Tr. 680. Mental status examination findings were within normal limits or average with the exception of judgment which was noted to be fair. Tr. 681. Teodecki preferred individual therapy. Tr. 681. Ms. Gardner noted that, as of June 10, 2016, Teodecki's diagnosis was intermittent explosive disorder. Tr. 682.

On April 3, 2017, Teodecki saw Bridget Mansell, PA-C, and Dr. Morgan Jones, M.D., in the Sports Health Center at the Cleveland Clinic regarding her left knee pain. Tr. 726. Teodecki relayed that she had been having problems with her knee for 10 months, noting that she had fallen the prior June. Tr. 726. Physical examination of the left knee showed decreased flexion on active and passive range of motion; tenderness in the medial jointline; trace swelling/effusion; stability, muscle strength, sensation, and reflexes were normal. Tr. 727. There was a positive

McMurray's test.[6]  Tr. 728.  There were normal examination findings of the right knee.  Tr. 728.

An MRI of the left knee was recommended.  Tr.  728.

On April 5, 2017, Teodecki saw Dr. Anthony Smartnick, III, M.D., at Solutions for a

psychiatric evaluation.  Tr. 791-792.  Dr. Smartnick noted Teodecki's history of depressive

symptoms, feeling overwhelmed and anxious, and prior psych trauma with abusive prior

relationship.  Tr. 791.  Other symptoms included possible PTSD symptoms, anhedonia, anergia

due to need for sleep, irritable mood, agitation, and flashbacks over past abuse.  Tr. 791.

Teodecki's limited mental health treatment included counseling at Solutions in 2016.  Tr. 791.

Teodecki had dropped out of treatment from Solutions.  Tr. 791.  On mental status examination,

Dr. Smartnick observed an angry/hostile, anxious and irritable mood and constricted range of

affect.  Tr. 792.  Otherwise, mental status examination findings were good, average or above

average, and/or normal or within normal limits.  Tr.  792.  Dr. Smartnick's diagnosis was anxiety

disorder, unspecified.  Tr. 792.  Dr. Smartnick prescribed Celexa and recommended that

Teodecki continue with counseling.  Tr. 792.

On April 13, 2017, Teodecki saw Dr. Jones for follow up regarding her left knee and

MRI review.  Tr. 735.  Teodecki relayed continued muscular pain in the distal thigh and knee.

Tr. 735.  Physical examination of the left knee showed decreased flexion on active and passive

range of motion; tenderness in the lateral jointline and patellofemoral; there was no

swelling/effusion; and stability, muscle strength, and sensation were normal.  Tr. 721, 735.

Physical examination of the right knee was normal.  Tr. 721.  Dr. Jones indicated that imaging

was "[a]bnormal, lateral and patellofemoral mild chondral defect; no meniscal pathology." Tr.

721, *see also* Tr. 731-733, 737.  Dr. Jones' assessment and plan was "left knee mild

---

[6] "McMurray's test is used to determine the presence of a meniscal tear within the knee."
https://www.physio-pedia.com/McMurrays_Test (last visited 7/6/2021).

osteoarthritis" with follow up in two months.  Tr. 721.  Teodecki was referred to physical

therapy.  Tr. 722.

Teodecki continued to see Ms. Gardner in April, May, and June 2017 for therapy.  Tr.

785-787, 790.  During her April 24, 2017, counseling session, Teodecki relayed that Dr.

Smartnick had started her on a new medication and "it [had] been amazing."  Tr. 790.  Teodecki

was not obsessing about things and not getting upset about everything.  Tr. 790.  She was

sleeping better and taking care of the house and her stepchildren, which made her feel good.  Tr.

790.  In May 2017, except for waking up out of a sound sleep and talking about many hard

things Teodecki had experienced in her life, Teodecki continued to have more energy and was

feeling good about that.  Tr.  787.

On June 22, 2017, Teodecki met with a new neurologist, Betsy Garratt, D.O., at

University Hospitals, for an initial evaluation regarding her migraines, seizures, and history of

brain injury in 1992.  Tr. 807-811.  Teodecki explained that she sought treatment at the

Cleveland Clinic for her epilepsy and to get her seizures under control.  Tr. 807.  She had been

placed on a combination of Dilantin and Lamictal.  Tr. 807.  Teodecki reported worsening of her

migraines and dizziness and she was having numbness in her left leg.  Tr. 807-808.  Teodecki

snored loud at night but there was no apnea.  Tr. 808.  Teodecki's headaches were preceded by

dizziness.  Tr. 808.  She reported having constant pain in the front of her head that worked itself

around her head, explaining "[i]t is like a stabbing."  Tr. 808.  Teodecki was able to tolerate the

light and there was no associated nausea or vomiting with her headaches.  Tr. 808.  However, she

was experiencing episodes on a daily basis and she reported extreme fatigue, noting that she

would lie down on the couch and sleep through the day.  Tr. 808.  Teodecki relayed that the

described symptoms started in October 2016.  Tr. 808.  Dr. Garratt noted unremarkable mental

status findings on neurological examination. Tr. 810. Dr. Garratt observed that Teodecki's examination was "significant for bilateral diffuse nystagmus and dizziness with extra ocular movements." Tr. 811. Dr. Garratt felt that the headaches that Teodecki was describing were most consistent with tension-type headaches. Tr. 811. Because of "the diffuse nystagmus[,]" Dr. Garratt recommended an MRI. Tr. 811. Also, Dr. Garratt requested that Teodecki get a Dilantin level the next morning before she took her morning dose because Dr. Garratt thought that many of Teodecki's symptoms might be related to Dilantin toxicity. Tr. 811.

When Teodecki saw Ms. Gardner for counseling sessions in June 2017, Teodecki relayed that she was trying to separate from negative family and friends. Tr. 785, 786. She was tired all the time. Tr. 785. She reported she was happy to have moved on to a new neurologist but was disappointed in her other doctor who Teodecki reported "did nothing for me." Tr. 785.

Teodecki also saw Dr. Smartnick on July 11, 2017. Tr. 783-784. Dr. Smartnick noted that Teodecki was changing neurologists and working on changing her seizure medication. Tr. 783. Teodecki was taking Celexa with a good response and her mood was stable. Tr. 783. On psychological examination, there were no abnormal findings. Tr. 783. Dr. Smartnick continued to note a diagnosis of anxiety disorder, unspecified. Tr. 783. He recommended no change to Teodecki's medication or treatment. Tr. 784.

In 2017 and 2018, Teodecki received some treatment for her mental health impairments at Bellefaire JCB. Tr. 924-977

Following her brain MRI, Teodecki saw Dr. Garratt on July 20, 2017. Tr. 800-803. Dr. Garratt indicated that the MRI showed "areas of white matter changes bifrontal, likely consistent with her prior history of TBI." Tr. 802; *see also* Tr. 780-781. After her June 2017 appointment with Dr. Garratt, Teodecki had decreased her Dilantin on her own. Tr. 803. Teodecki reported

significant improvement in her dizziness and denied any seizure activity. Tr. 803. Dr. Garratt recommended moving Teodecki off Dilantin and switching to Topamax. Tr. 803. Dr. Garratt noted some improvement in the nystagmus during the examination. Tr. 803. Dr. Garratt was hopeful that the Topamax would work for both her epilepsy and migraine headaches and that Teodecki would be able to stop taking verapamil. Tr. 803.

On September 6, 2017, Teodecki sought emergency room treatment for bruising in her right arm, tingling in her arms and legs, and shortness of breath. Tr. 892-893. An ECG was normal. Tr. 895. The final impression was spontaneous ecchymosis; adverse reaction of antiepileptic, initial encounter; dyspnea and respiratory abnormalities. Tr. 897. She was stable for discharge. Tr. 897.

On September 21, 2017, Teodecki saw Dr. Garratt for follow up regarding her migraines and epilepsy. Tr. 796. Teodecki relayed that her migraine frequency had not improved with the Topamax. Tr. 796. She had stopped taking Dilantin and verapamil. Tr. 796. Teodecki denied any seizures and, overall, her dizziness and eye movement had improved. Tr. 796. However, she was having some blurry vision since increasing her Topamax dose. Tr. 796. Dr. Garratt listed the following diagnoses – common migraine without aura, vision changes, nystagmus, and epilepsy. Tr. 798. Dr. Garratt recommended an ophthalmology evaluation. Tr. 798. Dr. Garratt noted that, initially, Teodecki's headache frequency and dizziness appeared to be really improving following the change in medication. Tr. 799. However, Teodecki was reporting less of a response, especially with respect to her headaches. Tr. 799. Teodecki was not interested in trying different medications for her migraines but she would consider a referral for Botox with Dr. Reed. Tr. 799. Dr. Garratt indicated that they would await the ophthalmology appointment and then consider further evaluation. Tr. 799.

Upon Dr. Garratt's referral, on February 26, 2018, Teodecki saw Dr. Deborah Reed, M.D., for a neurological evaluation regarding her migraine headaches. Tr. 821-826. Teodecki was on "Topamax times 1 year." Tr. 821. Teodecki relayed that she did not feel that it had an impact on her headaches but it helped with seizures and there were no side effects. Tr. 821. Teodecki was also taking "[L]amictal times 20 years for seizures." Tr. 822. That did not impact her headaches. Tr. 822. Her last seizure was six to seven years prior and it was a "partial complex seizure." Tr. 822. Teodecki had tried various over-the-counter pain relievers for her migraines without success. Tr. 822. She also tried Percocet and Oxycontin but they knocked here out and were no effective. Tr. 822. Vicoprofen had helped with her migraines but they would come back. Tr. 822. Teodecki indicated that marijuana was effective with one "hit" and it lasted three to four hours. Tr. 822. Teodecki had not tried Toradol, Medrol, nerve blocks or Botox injections. Tr. 822. Teodecki slept a lot during the day – usually because of migraine pain. Tr. 822. Teodecki never had children because of being on Dilantin and seizures but she wanted to have children. Tr. 822. On physical examination, Dr. Reed noted that Teodecki's left leg was "'weak' not to testing" but her muscle bulk, strength and tone were normal in upper and lower extremities. Tr. 824. However, Teodecki's coordination and gait were abnormal. Tr. 824. Dr. Reed's impression was "Question REM sleep disorder off of dilantin consider neurontin during 'bad weeks[.]" Tr. 826. Dr. Reed recommended Botox and suggested that they schedule injections for four weeks later. Tr. 826. Dr. Reed adjusted Teodecki's medications. Tr. 826.

Teodecki saw Dr. Garratt on March 12, 2018, for follow up. Tr. 936. Teodecki reported she was continuing to take naps and marijuana was the only thing that was helping with headaches. Tr. 936. She was still having daily headaches and chronic dizziness. Tr. 936. She was going to schedule Botox injections with Dr. Reed. Tr. 936. Teodecki attended her

appointment with her boyfriend and they relayed that they were considering having children. Tr. 936. On neurological examination, Teodecki's mental status was unremarkable. Tr. 939. Her gait was normal. Tr. 939. Dr. Garratt observed that Teodecki's nystagmus appeared to be greatly improved; it was almost resolved. Tr. 939. Dr. Garratt explained that Teodecki would need to stop taking Topamax if she was considering having children. Tr. 939. They planned to taper Teodecki off of Topamax and keep her on another medication that was a preferred medication for epilepsy during pregnancy. Tr. 939.

Teodecki saw Dr. Garratt again on June 15, 2018. Tr. 1119; *see also* Tr. 930. Teodecki relayed that she did not have the Botox injections. Tr. 1119. She had been in the hospital for abdominal pain and was told she had growths on her adrenal gland. Tr. 1119. She had been referred to a GI doctor who was going to do a colonoscopy and endoscopy. Tr. 1119. Teodecki had a prior sleep study and did not have sleep apnea but she continued to snore at night and felt daytime somnolence. Tr. 1119. Teodecki's GI doctor thought GERD might be causing her snoring so he recommended that she start on medication for acid reflux. Tr. 1119. Teodecki relayed having a headache a few days prior that lasted three days. Tr. 1119. On neurological examination, Teodecki's mental status was unremarkable. Tr. 1122. Her gait was normal. Tr. 1122. Dr. Garratt discussed decreasing her Topamax because Teodecki was still considering children. Tr. 1122. Dr. Garratt explained to Teodecki that her headaches might increase as she stops the Topamax. Tr. 1122. Dr. Garratt recommended that Teodecki follow up with Dr. Reed regarding the Botox injections. Tr. 1122.

When Teodecki saw Dr. Garratt on September 28, 2018, for follow up, Teodecki was completely off Topamax and on Lamictal monotherapy. Tr. 1113. She reported sleeping from 8:30 p.m. to 6:30 a.m. Tr. 1113. After getting the kids ready for school, by 8:30 a.m., her head

would start really hurting and she had dizziness.  Tr. 1113.  She relayed that she would fall

asleep for the rest of the day.  Tr. 1113.  Teodecki indicated she was awake for about six hours

each day but, at times, she was still falling asleep at the dinner table.  Tr. 1113.  Teodecki felt

completely wiped out from doing chores at home and tried to walk their dog but she felt too

tired.  Tr. 1113.  Examination findings were similar to those from the previous visit with Dr.

Garratt.  Tr. 1116.  Teodecki was not interested in going back on Topamax.  Tr. 1116.  Insurance

did not approve Botox injections.  Tr. 1116.  Dr. Garratt thought that "a CGRP receptor

antagonist could [maybe] be considered."  Tr. 1116.  Regarding the excessive daytime

sleepiness, Dr. Garratt recommended that she be further evaluated by a sleep specialist and that it

could be related to depression.  Tr. 1116.  Dr. Garratt also recommended that Teodecki's primary

care physician should look for medical causes such as thyroid abnormality.  Tr. 1116.  Dr.

Garratt also noted that she felt that Teodecki could greatly benefit from weight loss and she

should work on modifying her diet and start a regular exercise program.  Tr. 1116.  With respect

to Teodecki's seizures, Dr. Garratt recommended an EEG since the Topamax had been stopped

and Dr. Garratt wanted Teodecki to get her medication levels checked.  Tr. 1116.  Also, Dr.

Garratt instructed Teodecki to report any seizure activity to her immediately.  Tr. 1116.

Plaintiff submitted medical records to the Appeals Council after the ALJ's decision.

Doc. 16, pp. 4-5, Tr. 2.  The Appeals Council found that the evidence submitted was a copy of

evidence already submitted; it did not show a reasonable probability that it would change the

outcome of the decision; and/or it did not relate to the period at issue.  Tr. 2.  The Sixth Circuit

has held that where, as here, the Appeals Council denies review and the ALJ's decision becomes

the Commissioner's decision, the court's substantial evidence review is limited to the evidence

presented to the ALJ. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001); *Cline v.*

*Commissioner,* 96 F.3d 146,148 (6th Cir. 1996); *Cotton v. Sullivan,* 2 F.3d 692, 696 (6th Cir. 1993); *Casey v. Secretary of Health & Human Servs.,* 987 F.2d 1230, 1233 (6th Cir. 1993); *see also Osburn v. Apfel,* No. 98-1784, 1999 WL 503528, at *4 (6th Cir. July 9, 1999) ("Since we may only review the evidence that was available to the ALJ to determine whether substantial evidence supported [the] decision, we cannot consider evidence newly submitted on appeal after a hearing before the ALJ."). Thus, the evidence first submitted to the Appeals Council is not considered herein.

**2.     Opinion evidence**

Upon initial review, on April 26, 2017, state agency psychological reviewing consultant Karla Delcour, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 268-269) and Mental RFC Assessment (Tr. 272-273). In the PRT, Dr. Delcour found that Teodecki had no limitations in her ability to understand, remember or apply information; mild limitations in her ability to adapt or manage oneself; and moderate limitations in her ability to interact with others and concentrate, persist or maintain pace. Tr. 268. Dr. Delcour opined that Teodecki had the mental RFC to perform simple, repetitive and one to two step tasks and she could perform tasks that required no more than superficial social interactions with coworkers, supervisors, and the public. Tr. 272-273.

Also, upon initial review, on April 28, 2017, state agency reviewing consultant Indira Jasti, M.D., completed a Physical RFC Assessment. Tr. 270-272. Dr. Jasti opined that Teodecki had the physical RFC to occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and her ability to push and/or pull was "[u]nlimited, other than shown, for lift and/or carry[.]" Tr. 270. Dr. Jasti opined that Teodecki could never climb ladders/ropes/scaffolds; she

could occasionally climb ramps/stairs and frequently stoop, kneel, crouch and crawl. Tr. 270-271. Dr. Jasti also opined that Teodecki should avoid all exposure to hazards and concentrated exposure to noise. Tr. 271. As explanation for the postural and environmental limitations, Dr. Jasti noted Teodecki's seizures and her history of migraines. Tr. 271.

Upon reconsideration, on May 19, 2017, state agency reviewing psychological consultant Robyn Murry-Hoffman, Ph.D., completed a PRT (Tr. 295-296) and Mental RFC Assessment (Tr. 299-301), reaching findings that were generally consistent with those of Dr. Delcour (Tr. 268-269, 272-273).

Also, upon reconsideration, on May 23, 2017, state agency reviewing consultant, Elizabeth Roseberry, M.D., completed a Physical RFC Assessment. Tr. 297-299. Dr. Roseberry's findings were similar to Dr. Jasti's opinions. However, Dr. Roseberry found that Teodecki would be limited to occasional pushing and/or pulling with the left lower extremity due to left leg pain and peripheral neuropathy. Tr. 298. Also, in addition to the other postural limitations found by Dr. Jasti, Dr. Roseberry, concluded that Teodecki would be limited to frequent balancing (Tr. 298), whereas Dr. Jasti indicated that Teodecki's ability to balance was unlimited (Tr. 271). Dr. Roseberry explained that the postural limitations were included due to seizures and left leg pain. Tr. 298.

C. **Testimonial evidence**

1. **Plaintiff's testimony**

Teodecki was represented and testified at the hearing. Tr. 213, 216-250. Although Teodecki can drive, a friend drove her to the hearing. Tr. 218. Teodecki has a medical restriction on her driver's license for seizures. Tr. 219. Teodecki had not had a seizure for a

couple of years. Tr. 219, 231. She had recently been taken off her seizure medication but was put back on it for her migraines. Tr. 219, 230.

When Teodecki was most recently employed she missed a lot of work due to not knowing if she was having a seizure and she was seeing a doctor. Tr. 220. Also, she kept falling asleep at her desk and she "was so overtired." Tr. 220, 241-242.

When asked what prevented her from working, Teodecki stated:

> I have horrible migraines, and I have them every day. Once I can get up in the morning at like 6:30 a.m., 7:00 a.m., I get up, and I immediately have my coffee so I can get the kids on the bus. But, I am still lackadaisical. My head is hurting, and then once the kids get on the bus, it's bad. I have limited amount of time to even take [a] shower or do anything. And, I am right back asleep again because I am dizzy, and I have a migraine.

Tr. 229.

Teodecki relayed that the children can take care of their own needs in the morning. Tr. 218. She usually sits on the couch and waits for their bus to come – sometimes she falls asleep. Tr. 218. During a typical day, Teodecki usually goes to bed around 8:30 or 9:00 p.m. and she sleeps until 6:00 or 6:30 a.m. Tr. 239. She is up until 9:30 or 10:00 a.m. and then she falls asleep and will not wake up until she hears an alarm or someone wakes her up. Tr. 239.

Teodecki explained that she was starting to get a migraine while at the hearing. Tr. 229. When asked how long one of her migraines last, Teodecki indicated that she usually sleeps all day and when she wakes up her migraine is mostly gone but she is dizzy and confused. Tr. 229. Initially, as treatment for her headaches, Teodecki's neurologist, who she had been treating with for a long time, had her on Dilantin. Tr. 229-230. However, she was not happy with him so she switched to a new neurologist. Tr. 229-230, 241-242. Her new neurologist, Dr. Garratt took her off Dilantin and put her on Topamax. Tr. 230. The Topamax was helping Teodecki with her

seizures and migraines.  Tr. 230.  Teodecki then stopped taking it for a while but had to start taking again because of her headaches.  Tr. 219, 230.

In addition to the Topamax, Teodecki takes other medications for her migraines.  Tr. 240-241.  Teodecki said the medications help to some extent.  Tr. 241.  Without the medication, her migraines are very severe, explaining "It's almost like I'm having a seizure while the migraine[] is taking place, which is scary."  Tr. 241.  Teodecki's medications cause her to be tired all the time.  Tr. 241.  She sleeps a lot because of her headaches.  Tr. 249.  Teodecki indicated that, if she had to sit at a desk and do work, she would fall asleep.  Tr. 242.  She estimated being able to stay awake maybe four-and-a-half hours before falling asleep.  Tr. 242.  After that period of time, Teodecki would sleep for almost eight hours.  Tr. 242-243.

Teodecki relayed that she was scheduled to have two different sleep studies conducted.  Tr. 244-245.  One of the studies was a "regular" sleep study scheduled by her primary care physician and the other was a "sleep deprived" study scheduled by her neurologist.  Tr. 244-245.  Teodecki's primary care physician was trying to find out why Teodecki was tired all the time.  Tr. 245.  Teodecki's neurologist wanted the other study performed to evaluate Teodecki's sleepiness and she wanted to make sure she was not having any seizures.  Tr. 245-246.

Dr. Garratt referred Teodecki to Dr. Reed, a migraine specialist.  Tr. 230.  Teodecki's doctors have recommended Botox injections for her headaches but her insurance denied coverage for them.  Tr. 230.  Per her doctor's recommendation, the day prior to the hearing, Teodecki started subcutaneous injections that she had to give to herself once a month.  Tr. 230-231.  When asked whether Teodecki noticed any improvement since giving herself the first injection, Teodecki stated "I'm still dizzy.  I mean, I was sitting out in the waiting room sleeping."  Tr. 231.

Teodecki was trying to lose weight. Tr. 232. Her neurologist recommended that she run in place every day for ten minutes. Tr. 232. Teodecki tried to do that but it made her head hurt even worse. Tr. 232. Teodecki explained that, a day or two before the hearing, she was on the bathroom floor because her headache was so bad. Tr. 232.

Teodecki has fallen due to her dizziness. Tr. 232. She indicated that the last time she fell was about a week before the hearing. Tr. 232. Going up and down stairs is difficult for her. Tr. 233. Teodecki has not had a fall that required calling an ambulance or seeking emergency medical treatment. Tr. 233.

Teodecki has had surgery on both her knees. Tr. 233. She wears a brace on her right knee when the weather gets bad. Tr. 233. Sometimes, but not often, she also has to wear a brace on her left knee. Tr. 233. Teodecki's doctor has suggested physical therapy and possibly more surgery for her knees. Tr. 233-234. Teodecki was not interested in physical therapy because, when she had tried physical therapy in the past following a surgery, the therapy hurt and made things worse. Tr. 234.

For her pain, Teodecki takes Ibuprofen. Tr. 239. She also takes a muscle relaxer at night. Tr. 239. Teodecki has neuropathy in her legs and hands. Tr. 234. Teodecki explained that the pain is in her lower left back and it goes down into her leg and into her knee and her leg becomes tingly. Tr. 247. When asked whether Teodecki has problems with standing or walking, she replied "I force myself to. I have a high pain tolerance, so I really force myself." Tr. 247. However, she does not stand a lot; if she stands the pain starts to "shoot across [her] lower left back." Tr. 248. When she is at home, she usually lies on the couch or stretches her left knee if she is sitting. Tr. 248.

Teodecki also explained that she has tingling down her arms with shooting pains. Tr. 234. Teodecki is able to button a shirt and brush her hair. Tr. 248. However, she drops things. Tr. 234, 248. Teodecki recalled dropping something either that week or the week prior. Tr. 234. As a result of the head injury that she suffered when she was nine years old, Teodecki indicated that she has short- and long-term memory problems. Tr. 234-235, 242-243, 244.

With respect to her mental health treatment, Teodecki was seeing Dr. Smartnick as well as a counselor. Tr. 236. She was prescribed Citalopram (a generic form of Celexa) for anxiety and depression. Tr. 236, 246. Teodecki's doctor has continued to increase the dosage of her Citalopram. Tr. 236. However, per Teodecki, her doctor does not want to increase it anymore because he is concerned she will have a seizure. Tr. 236. If Teodecki feels panicked or anxious, she secludes herself in a room, away from people. Tr. 236. Teodecki has a hard time handling confrontation and tries to avoid confrontation because it causes her anxiety; she panics and shuts down. Tr. 237. When Teodecki is having a panic attack, she usually has to walk away for at least 10 to 15 minutes to calm herself down. Tr. 237.

Teodecki visits with her parents a couple of times each week. Tr. 237. She tries to help her parents with things when she visits but she indicated that they are very independent and will not let her help them. Tr. 238. Teodecki sees her sister once or twice each week when her sister comes over to visit at their parents' house. Tr. 238. Teodecki does not see her brother as much as she sees her sister but they talk on the phone. Tr. 238. In addition to the friend that brought Teodecki to the hearing and her boyfriend, there is another neighbor that Teodecki sees, but not often. Tr. 238.

Teodecki does not perform many household chores. Tr. 246-247. She tries to do some chores in the morning when she first gets up but the kids help a lot. Tr. 246. She helps a little

with the laundry.  Tr. 247.  If there is laundry in the washer, she might pull it out that day, but sometimes she forgets to take it out so it has to be washed again.  Tr. 247.  On occasion, she goes grocery shopping with her boyfriend but he often picks things up from the store on his way home.  Tr. 247.  If Teodecki does go to the grocery store, she has to have a written list.  Tr. 247.

### 2.    Vocational expert's testimony

A Vocational Expert ("VE") testified at the hearing.  Tr. 252-260.  The VE described Teodecki's past work, which included positions of collections clerk (sedentary, skilled position), administrative assistant (sedentary, skilled position, performed by Teodecki at the medium level), medical assistant (light, skilled position), data entry clerk (sedentary, semi-skilled position), and dispatcher (sedentary, skilled position).  Tr. 252-253.

For his first hypothetical, the ALJ asked the VE to consider an individual Teodecki's age and with her education and work experience who had the RFC to perform work at the same exertional level (light) and with the additional limitations contained in the RFC that the ALJ ultimately assessed as Teodecki's RFC (Tr. 197).  Tr. 253-254.  According to the VE, the described individual would be unable to perform Teodecki's past work.  Tr. 254-255.  However, the VE indicated that there would be other work available in the national economy that the described individual could perform, including mail clerk, inspector and hand packager, and gluer.  Tr 255.  The VE provided job incidence data for each of the identified jobs.  Tr. 255.

For his second hypothetical, the ALJ asked the VE to consider the first hypothetical except that the individual would be limited to handling and fingering occasionally with the bilateral upper extremities (rather than frequently (Tr. 253-254)).  Tr. 255.  The VE indicated that with that change there would be no jobs available.  Tr. 255-256.  The same would be true if

the first hypothetical was modified from light to sedentary work along with the modification to occasional rather than frequent handling and fingering.  Tr. 256.

For his fourth hypothetical, the ALJ asked the VE to consider the first hypothetical with the only modification being sedentary rather than light exertional work.  Tr. 256.  With that change, the VE indicated that there would be jobs available for the described individual, including an assembly job known as patcher, an inspection job known as a touch-up screener, and an ampoule sealer.  Tr. 256-257.  The VE provided job incidence data for each of the identified jobs.  Tr. 256-257.

The VE indicated that being off task for more than 15 percent of the time becomes work preclusive.  Tr. 257.  Generally, employers will "tolerate two absences, tardies, and leaving early."  Tr. 257.  "Beyond two [absences], it becomes work preclusive."  Tr. 257.  In the unskilled work setting, the VE indicated that, in his experience, there was no tolerance of unscheduled breaks.  Tr. 257.  Also, the VE indicated that there would be no work that would allow for an individual to take naps during scheduled breaks.  Tr. 257-258.

Finally for the first (light) and fourth (sedentary) hypotheticals, the ALJ asked the VE whether there would be an impact on the light and sedentary jobs that the VE identified if the individual could still have occasional interaction with supervisors but would have to work in isolation with no contract with the public or coworkers.  Tr. 258.  The VE indicated that there would be no work available.  Tr. 258.

Teodecki's counsel asked the VE whether there would be work available to someone who could work for four hours; would need a two-hour break; and then could work another four hours.  Tr. 259.  The VE indicated that there would be no work available under those parameters. Tr. 259.  Also, in response to questioning from Teodecki's counsel, the VE indicated that, if

someone was falling asleep at her desk even once per week, the first time it happened, the individual might get a written warning but she would likely be terminated the second time it occurred. Tr. 259.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[7] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.      If claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[8] claimant is presumed disabled without further inquiry.

---

[7] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

[8] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[9] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In his December 27, 2018, decision the ALJ made the following findings:[10]

1. Teodecki meets the insured status requirements of the Social Security Act through December 31, 2021. Tr. 195.

2. Teodecki has not engaged in substantial gainful activity since January 3, 2017, the alleged onset date. Tr. 195.

3. Teodecki has the following severe impairments: obesity; post-traumatic seizure disorder; epilepsy; migraine; vertigo; gastroesophageal reflux disease (GERD); peripheral neuropathy; osteoarthritis and medial

---

considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

[9] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[10] The ALJ's findings are summarized.

meniscus tear of left knee; history of right knee meniscus tear; anxiety disorder; and intermittent explosive disorder.[11]  Tr. 195.

4.　　Teodecki does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  Tr. 196-197.

5.　　Teodecki has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) except she could occasionally push, pull and operate foot controls with the left lower extremity; she could never climb ladders, ropes, or scaffolds, but she could occasionally climb ramps and stairs; occasionally kneel, crouch and crawl; and frequently balance and stoop; she could frequently handle and finger with the bilateral upper extremities; she must avoid concentrated exposure to loud and very loud noise, and very bright lights (defined as brighter than the typical office setting), and avoid all exposure to hazards such as unprotected heights, moving mechanical parts and the operation of motor vehicles; she could perform simple, routine and repetitive tasks, but not at a production rate pace (such as assembly line work); she could interact on an occasional basis with supervisors, coworkers and the general public, but she should be limited to superficial contact meaning no sales, arbitration, negotiation, conflict resolution or confrontation, no group, tandem or collaborative tasks, and no management, direction or persuasion of others; she could respond appropriately to occasional change in a routine work setting, as long as any such changes are easily explained and/or demonstrated in advance of gradual implementation.  Tr. 197-201.

6.　　Teodecki is unable to perform any past relevant work.  Tr. 201-202.

7.　　Teodecki was born in 1982 and was 32 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 202.

8.　　Teodecki has at least a high school education and is able to communicate in English.  Tr. 202.

9.　　Transferability of job skills is not material to the determination of disability.  Tr. 202.

10.　Considering Teodecki's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Teodecki can perform, including mail clerk, inspector and hand packager, and gluer.  Tr. 202-203.

---

[11] The ALJ also found several non-severe impairments.  Tr. 196.

Based on the foregoing, the ALJ determined Teodecki had not been under a disability, as defined in the Social Security Act, from January 3, 2017, through the date of the decision. Tr. 203.

## V. Law & Analysis

### A.      Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.      Reversal and remand is warranted**

Teodecki asserts that the ALJ erred in assessing the credibility of her subjective statements regarding her symptoms.  Doc. 16, pp. 16-18.

A claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability.  20 C.F.R. § 404.1529(a); SSR 16-3p, 2017 WL 5180304.   When a claimant alleges impairment-related symptoms, a two-step process is used to evaluate those symptoms.  20 C.F.R. § 404.1529(c); 2017 WL 5180304, * 2-8.

First, a determination is made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms, e.g., pain.  SSR 16-3p, 2017 WL 5180304, * 3-4.  Second, once the foregoing is demonstrated, an evaluation of the intensity and persistence of the claimant's symptoms is necessary to determine the extent to which the symptoms limit the claimant's ability to perform work-related activities.  *Id*. at * 3, 5-8.  To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, information from medical and non-medical sources, treatment received, and other evidence.  SSR 16-3p, 2017 WL 5180304, * 5-8.  In addition to this evidence, the factors set forth in 20 C.F.R. 404.1529(c)(3) are considered.  *Id.* at *7-8.  Those factors include daily activities; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication for relief of pain or other symptoms; measures other than treatment a claimant uses to relieve pain or other symptoms, e.g., lying flat on one's back; and any other factors pertaining to a claimant's

functional limitations and restrictions due to pain or other symptoms. *Id.* The ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id*. at * 10.

An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)).

Teodecki's challenge to the ALJ's assessment of her subjective statements regarding her symptoms is centered on the ALJ's consideration of her reports of fatigue. Doc. 16, pp. 16-18. The ALJ stated the following regarding Teodecki's reports of fatigue:

> While the fatigue described during the hearing was reported to a medical professional, it appears to have only gotten to the point of excessive daytime sleeping very recently. There is no indication that this condition has lasted, or will last at least 12 months at the level currently described. Further, this increase in fatigue and headaches occurred after the claimant ceased Topamax due to her plans to become pregnant. Her plans to carry out a pregnancy and care for a newborn are not entirely consistent with her allegations that she cannot even stay awake long enough to eat dinner. (30F/4) Further, she testified that she had the start of a migraine during the hearing, and she was not incapacitated. She remained awake, alert, and able to provide relevant testimony.

Tr. 199-200.

Teodecki takes issue with the ALJ's finding that she only recently started reporting excessive daytime sleepiness to her doctors and, therefore, her excessive daytime sleepiness problem did not exist for twelve months. Doc. 16, p. 18. Teodecki contends that the records document excessive daytime sleepiness since January 2017 and therefore the ALJ erred. Doc.

16, p. 18. In support, she points to medical records from January 18, 2017 (Tr. 676), March 9, 2017 (Tr. 706), June 22, 2017 (Tr. 808), February 26, 2018 (Tr. 822), and September 28, 2018 (Tr. 1113). Doc. 16, p. 18.

Teodecki alleged disability beginning on January 3, 2017. Tr. 194. Due to wanting to try to have children, Teodecki was taken off of Topamax as of September 28, 2018. Tr. 1113. While it was at that visit that Teodecki reported sleeping throughout the day and falling asleep at the dinner table (Tr. 1113), that was not the first time that Teodecki reported extreme fatigue or sleeping a lot during the day. The records cited by Teodecki show reports of sleeping during the day or excessive daytime sleepiness as far back as March 2017.[12] For example, during a March 9, 2017, visit with Dr. Dorsett, Teodecki reported excessive daytime sleepiness/being sleepy all day and snoring loudly at night. Tr. 706. Dr. Dorsett ordered an overnight sleep study and ENG. Tr. 706. Subsequently, during a June 22, 2017, visit with Dr. Garratt, Teodecki reported daily episodes of headaches and dizziness along with extreme fatigue and that she would "lie down on the couch and sleep through the day." Tr. 808. On February 26, 2018, Teodecki reported sleeping a lot during the day, usually because of migraine pain. Tr. 822. Also, while the ALJ stated that there "was no mention of concern about sleep patterns[]" in June 2018 (Tr. 199, citing Exhibit 30F/7-11, Tr. 1119-1123) that finding is not fully supported by the record. For example, during her June 15, 2018, visit with Dr. Garrett, Teodecki reported feeling "daytime somnolence." Tr. 1119.

In addition to the above noted earlier reports of excessive sleepiness and/or sleeping through the day that are inconsistent with the ALJ's suggestion that Teodecki's fatigue only recently became excessive, the ALJ's suggestion that the increase in fatigue and headaches was

---

[12] The January 18, 2017, record reflects reports of fatigue but not excessive daytime sleeping or sleepiness. Tr. 676.

the result of stopping Topamax to try to get pregnant is also not fully supported. As noted above, Teodecki had completely stopped Topamax in September 2018. Tr. 1113. However, her excessive sleepiness and sleeping through the day was reported prior to that time. *See e.g.*, Tr. 706, 808, 822. Also, when Teodecki saw Dr. Garratt on September 28, 2018, and reported her excessive sleepiness, Dr. Garratt did not directly associate the reported excessive sleepiness with Teodecki having gone off Topamax. Tr. 1116. Dr. Garratt recommended that Teodecki be evaluated by a sleep specialist and noted that it could be related to depression. Tr. 1116. Dr. Garratt also noted that Teodecki's primary care physician should look for other medical causes such as thyroid abnormalities and that Teodecki could benefit from weight loss and should try to modify her diet or start an exercise program. Tr. 1116.

At the hearing, the VE testified that there would be no work that would allow for someone to take naps during scheduled breaks. Tr. 257-258. Also, Teodecki's counsel asked the VE whether there would be work available to someone who could work for four hours; would need a two-hour break; and then could work another four hours. Tr. 259. In response, the VE indicated that there would be no work available under those parameters. Tr. 259. Also, in response to questioning from Teodecki's counsel, the VE indicated that, if someone was falling asleep at her desk even once per week, the first time it happened, the individual might get a written warning but she would likely be terminated the second time it occurred. Tr. 259.

Considering the foregoing, the Court finds that the ALJ either overlooked or misconstrued evidence when assessing Teodecki's subjective allegations of extreme fatigue. Therefore, without a more thorough analysis, the Court is unable to meaningfully assess whether the ALJ's assessment of Teodecki's subjective allegations regarding her fatigue and decision finding Teodecki not disabled are supported by substantial evidence. Further, although the

ALJ's assessment of Teodecki's subjective symptoms consisted of more than just his assessment of the extent and nature of her complaints of fatigue, in light of the VE's testimony in this case regarding the effects of needing breaks or naps on the availability of jobs, the Court finds that reversal and remand is necessary for further analysis of Teodecki's subjective allegations regarding the extent and nature of her fatigue and, as necessary, further assessment and analysis of Teodecki's RFC and other findings, including at Step Five.

**C.     Other issues on appeal**

Teodecki also asserts that the ALJ did not properly evaluate the evidence, arguing that the ALJ erred by: (1) failing to properly consider how Teodecki's obesity contributed to her joint pain; (2) not considering the frequency of her migraine headaches; (3) finding that she had the RFC to perform light work; (4) not properly evaluating her mental health impairments under the listings and not finding that Teodecki was more limited due to her mental health impairments; and (5) not considering the combined effects of her impairments on her ability to engage in substantial gainful activity.  Doc. 16, pp. 11-16, Doc. 20, pp. 1-4.  Also, Teodecki argues that the Step Five determination is not supported by substantial evidence because the ALJ should have relied on VE hypotheticals that included limitations that those included in the ALJ's RFC.  Doc. 16, pp. 18-20, Doc. 20, p. 4.

The Court declines to address these additional arguments because, on remand, the ALJ will reassess Teodecki's subjective statements and that assessment may impact the ALJ's findings regarding Teodecki's RFC and other findings, including at Step Five.

## VI. Conclusion

For the reasons set forth herein, the Court **REVERSES AND REMANDS** the

Commissioner's decision for further proceedings consistent with this opinion and order.

Dated: July 6, 2021

*/s/ Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge